# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:17−cv−00406−JEB

| | |
|---|---|
| MASSACHUSETTS LOBSTERMEN'S ASSOCIATION et al v. ROSS, JR. et al | Date Filed: 03/07/2017 |
| Assigned to: Judge James E. Boasberg | Date Terminated: 10/05/2018 |
| Cause: Civil Miscellaneous Case | Jury Demand: None |
| | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **MASSACHUSETTS LOBSTERMEN'S ASSOCIATION** | represented by | **Jonathan Wood** |

                       **Jonathan Wood**
PACIFIC LEGAL FOUNDATION
3100 Clarendon Boulevard
Suite 610
Arlington, VA 22201
(202) 888−6881
Fax: (202) 888−6855
Email: jwood@pacificlegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua P. Thompson**
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419−7111
Fax: (916) 419−7747
Email: jthompson@pacificlegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Damien M. Schiff**
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419−7111
Fax: (916) 419−7747
Email: dms@pacificlegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Johanna B. Talcott**
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419−7111
Fax: (916) 419−7747

Email: jbt@pacificlegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd F. Gaziano**
PACIFIC LEGAL FOUNDATION
3100 Clarendon Boulevard
Suite 610
Arlington, VA 22201
(202) 465–8734
Fax: (916) 419–7747
Email: tfg@pacificlegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ATLANTIC OFFSHORE
LOBSTERMEN'S ASSOCIATION**

represented by **Jonathan Wood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua P. Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Damien M. Schiff**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Johanna B. Talcott**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd F. Gaziano**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LONG ISLAND COMMERCIAL
FISHING ASSOCIATION**

represented by **Jonathan Wood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua P. Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Damien M. Schiff**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Johanna B. Talcott**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd F. Gaziano**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GARDEN STATE SEAFOOD
ASSOCIATION**

represented by **Jonathan Wood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua P. Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Damien M. Schiff**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Johanna B. Talcott**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd F. Gaziano**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RHODE ISLAND FISHERMEN'S
ALLIANCE**

represented by **Jonathan Wood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua P. Thompson**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Damien M. Schiff**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Johanna B. Talcott**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd F. Gaziano**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**WILBUR J. ROSS, JR.**
*in his official capacity as Secretary of*
*Department of Commerce*

represented by **Davene Dashawn Walker**
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources
Division
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044
(202) 353–9213
Fax: (202) 305–0506
Email: davene.walker@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**BENJAMIN FRIEDMAN**
*in his official capacity as Deputy*
*Undersecretary for Operations for the*
*National Oceanic and Atmospheric*
*Association*

represented by **Davene Dashawn Walker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**RYAN ZINKE**
*in his official capacity as Secretary of the*
*Department of Interior*

represented by **Davene Dashawn Walker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**DONALD J. TRUMP**
*in his official capacity as President of the*
*United States*

represented by **Davene Dashawn Walker**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Defendant**

**JANE DOE**
*in her official capacity as Chairman for*
*the Council on Environmental Quality*

represented by **Davene Dashawn Walker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**NATURAL RESOURCES DEFENSE**
**COUNCIL, INC.**

represented by **Aaron S. Colangelo**
NATURAL RESOURCES DEFENSE
COUNCIL
1152 15th Street, NW
Suite 300
Washington, DC 20005
(202) 289−2376
Fax: (202) 289−1060
Email: acolangelo@nrdc.org
*TERMINATED: 03/22/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradford H. Sewell**
NATURAL RESOURCES DEFENSE
COUNCIL
40 West 20th Street
New York, NY 10011−4231
(212) 727−2700
Fax: (212) 727−1773
Email: bsewell@nrdc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine K. Desormeau**
NATURAL RESOURCES DEFENSE
COUNCIL
111 Sutter Street
21st Floor
San Francisco, CA 94104
415−875−6158
Fax: 415−795−4799
Email: kdesormeau@nrdc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael E. Wall**
NATURAL RESOURCES DEFENSE

COUNCIL
111 Suter Street
20th Floor
San Francisco, CA 94104
(415) 875−6162
Fax: (415) 795−4799
Email: mwall@nrdc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ian Fein**
NATURAL RESOURCES DEFENSE
COUNCIL
111 Sutter Street
21st Floor
San Francisco, CA 94104
(415) 875−6100
Fax: (415) 795−4799
Email: ifein@nrdc.org
*ATTORNEY TO BE NOTICED*

**Jacqueline M Iwata**
NATURAL RESOURCES DEFENSE
COUNCIL
1152 15th St. NW
Suite 300
Washington, DC 20005
202−289−2377
Email: jiwata@nrdc.org
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**CONSERVATION LAW**                   represented by **Peter Shelley**
**FOUNDATION, INC.**                                   CONSERVATION LAW FOUNDATION
                                                       62 Summer Street
                                                       Boston, MA 02110
                                                       (617) 850−1754
                                                       Fax: (617) 850−4010
                                                       Email: pshelley@clf.org
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**CENTER FOR BIOLOGICAL**              represented by **Roger M. Fleming**
**DIVERSITY**                                          EARTHJUSTICE
                                                       1625 Massachusetts Avenue, NW
                                                       Suite 702
                                                       Washington, DC 20036
                                                       (202) 667−4500

Fax: (202) 667–2356
Email: rfleming@earthjustice.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**R. ZACK KLYVER**                     represented by   **Roger M. Fleming**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**ALISON RIESER**                      represented by   **Daniel E. Alberti**
                                                        MCDERMOTT WILL & EMERY
                                                        275 Middlefield Road
                                                        Suite 100
                                                        Menlo Park, CA 94025
                                                        (650) 815–7400
                                                        Email: dalberti@mwe.com
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **David Quinn Gacioch**
                                                        MCDERMOTT WILL & EMERY LLP
                                                        28 State Street
                                                        Boston, MA 02109
                                                        (617) 535–4000
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Jessica Leigh Bayles**
                                                        STOEL RIVES, LLP
                                                        1150 18th Street, NW
                                                        Suite 325
                                                        Washington, DC 20036
                                                        (202) 398–1760
                                                        Fax: (202) 621–6394
                                                        Email: jessica.bayles@stoel.com
                                                        *TERMINATED: 10/23/2018*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**DONNA R. CHRISTIE**                  represented by   **Daniel E. Alberti**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

**David Quinn Gacioch**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Leigh Bayles**
(See above for address)
*TERMINATED: 10/23/2018*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JOSH EAGLE**                    represented by    **Daniel E. Alberti**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Quinn Gacioch**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Leigh Bayles**
(See above for address)
*TERMINATED: 10/23/2018*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LAW PROFESSORS**                represented by    **Douglas W. Baruch**
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
(202) 639–7052
Fax: (202) 639–7003
Email: douglas.baruch@friedfrank.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/07/2017 | 1 | | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090–4867676) filed by LONG ISLAND COMMERCIAL FISHING ASSOCIATION, ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Civil Cover Sheet, # 6 Summons, # 7 Summons, # 8 Summons, # |

| | | |
|---|---|---|
| | | 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons)(Thompson, Joshua) (Entered: 03/07/2017) |
| 03/07/2017 | | Case Assigned to Judge James E. Boasberg. (sth) (Entered: 03/08/2017) |
| 03/08/2017 | 2 | SUMMONS (5) Issued Electronically as to BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., RYAN ZINKE, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(sth) (Entered: 03/08/2017) |
| 03/09/2017 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Jonathan Wood, :Firm– Pacific Legal Foundation, :Address– 3033 Wilson Blvd., Suite 700. Phone No. – (202) 888–6881. Fax No. – (916) 419–7747 Filing fee $ 100, receipt number 0090–4871532. Fee Status: Fee Paid. by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE (Attachments: # 1 Declaration of Jonathan Calvin Wood, # 2 Text of Proposed Order)(Thompson, Joshua) (Entered: 03/09/2017) |
| 03/09/2017 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Todd F. Gaziano, :Firm– Pacific Legal Foundation, :Address– 3033 Wilson Blvd., Suite 700, Arlington, VA 22201. Phone No. – (202) 465–8734. Fax No. – (916) 419–7747 Filing fee $ 100, receipt number 0090–4871548. Fee Status: Fee Paid. by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE (Attachments: # 1 Declaration of Todd F. Gaziano, # 2 Text of Proposed Order)(Thompson, Joshua) (Entered: 03/09/2017) |
| 03/09/2017 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Damien M. Schiff, :Firm– Pacific Legal Foundation, :Address– 930 G Street, Sacramento, CA 95814. Phone No. – (916) 419–7111. Fax No. – (916) 419–7747 Filing fee $ 100, receipt number 0090–4871552. Fee Status: Fee Paid. by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE (Attachments: # 1 Declaration Damien Michael Schiff, # 2 Text of Proposed Order)(Thompson, Joshua) (Entered: 03/09/2017) |
| 03/09/2017 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Johanna B. Talcott, :Firm– Pacific Legal Foundation, :Address– 930 G Street, Sacramento, CA 95814. Phone No. – (916) 419–7111. Fax No. – (916) 419–7747 Filing fee $ 100, receipt number 0090–4871565. Fee Status: Fee Paid. by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE (Attachments: # 1 Declaration of Johanna Beth Talcott, # 2 Text of Proposed Order)(Thompson, Joshua) (Entered: 03/09/2017) |

| 03/10/2017 | | | MINUTE ORDER granting 3 Motion for Admission *Pro Hac Vice* of JONATHAN WOOD. Signed by Judge James E. Boasberg on 3/10/2017. (lcjeb1) (Entered: 03/10/2017) |
| --- | --- | --- | --- |
| 03/10/2017 | | | MINUTE ORDER granting 4 Motion for Admission *Pro Hac Vice* of TODD F. GAZIANO. Signed by Judge James E. Boasberg on 3/10/2017. (lcjeb1) (Entered: 03/10/2017) |
| 03/10/2017 | | | MINUTE ORDER granting 5 Motion for Admission *Pro Hac Vice* of DAMIEN M. SCHIFF. Signed by Judge James E. Boasberg on 3/10/2017. (lcjeb1) (Entered: 03/10/2017) |
| 03/10/2017 | | | MINUTE ORDER granting 6 Motion for Admission *Pro Hac Vice* of JOHANNA B. TALCOTT. Signed by Judge James E. Boasberg on 3/10/2017. (lcjeb1) (Entered: 03/10/2017) |
| 03/29/2017 | 7 | | MOTION to Intervene by NATURAL RESOURCES DEFENSE COUNCIL, INC., CONSERVATION LAW FOUNDATION, CENTER FOR BIOLOGICAL DIVERSITY, R. ZACK KLYVER (Attachments: # 1 Memorandum in Support Memo of Law in Support of Intervention, # 2 Exhibit [Proposed] Answer in Intervention, # 3 Text of Proposed Order [Proposed] Order Granting Intervention, # 4 Exhibit Corporate Disclosure of NRDC, # 5 Exhibit Corporate Disclosure of CLF, # 6 Exhibit Corporate Disclosure of CBD)(Colangelo, Aaron) Modified filers on 3/30/2017 (znmw). (Entered: 03/29/2017) |
| 03/29/2017 | 8 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Bradford H. Sewell, :Firm– Natural Resources Defense Council, Inc., :Address– 40 West 20th Street, New York, NY 10011. Phone No. – (212) 727–4507. Fax No. – (415) 795–4799 Fee Status: No Fee Paid. by NATURAL RESOURCES DEFENSE COUNCIL, INC. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Colangelo, Aaron) (Entered: 03/29/2017) |
| 03/29/2017 | 9 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Michael E. Wall, :Firm– Natural Resources Defense Council, Inc., :Address– 111 Sutter Street, 21st Floor, San Francisco, CA 94104. Phone No. – (415) 875–6162. Fax No. – (415) 795–4799 Fee Status: No Fee Paid. by NATURAL RESOURCES DEFENSE COUNCIL, INC. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Colangelo, Aaron) (Entered: 03/29/2017) |
| 03/29/2017 | 10 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Katherine K. Desormeau, :Firm– Natural Resources Defense Council, Inc., :Address– 111 Sutter Street, 21st Floor, San Francisco, CA 94104. Phone No. – (415) 875–6158. Fax No. – (415) 795–4799 Fee Status: No Fee Paid. by MASSACHUSETTS LOBSTERMEN'S ASSOCIATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Colangelo, Aaron) (Entered: 03/29/2017) |
| 03/29/2017 | 11 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Peter Shelley, :Firm– Conservation Law Foundation, :Address– 62 Summer Street, Boston, MA 02110. Phone No. – (617) 850–1754. Fax No. – (617) 350–4030 Fee Status: No Fee Paid. by CONSERVATION LAW FOUNDATION, INC. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Colangelo, Aaron) (Entered: 03/29/2017) |

| 03/30/2017 | | | MINUTE ORDER granting 8 Motion for Leave to Appear *Pro Hac Vice* of BRADFORD H. SEWELL. Signed by Judge James E. Boasberg on 3/30/2017. (lcjeb3) (Entered: 03/30/2017) |
|---|---|---|---|
| 03/30/2017 | | | MINUTE ORDER granting 9 Motion for Leave to Appear *Pro Hac Vice* of MICHAEL E. WALL. Signed by Judge James E. Boasberg on 3/30/2017. (lcjeb3) (Entered: 03/30/2017) |
| 03/30/2017 | | | MINUTE ORDER granting 10 Motion for Leave to Appear *Pro Hac Vice* of KATHERINE DESORMEAU. Signed by Judge James E. Boasberg on 3/30/2017. (lcjeb3) (Entered: 03/30/2017) |
| 03/30/2017 | | | MINUTE ORDER granting 11 Motion for Leave to Appear *Pro Hac Vice* of PETER SHELLEY. Signed by Judge James E. Boasberg on 3/30/2017. (lcjeb3) (Entered: 03/30/2017) |
| 03/30/2017 | 12 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JANE DOE served on 3/23/2017; BENJAMIN FRIEDMAN served on 3/22/2017; WILBUR J. ROSS, JR. served on 3/22/2017; DONALD J. TRUMP served on 3/23/2017; RYAN ZINKE served on 3/22/2017 (Wood, Jonathan) (Entered: 03/30/2017) |
| 04/03/2017 | 13 | | NOTICE of Fees Paid for Pro Hac Vice Motions 8 , 9 , 10 , 11 by CONSERVATION LAW FOUNDATION, INC., MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, INC. (td) (ztd). (Entered: 04/06/2017) |
| 04/06/2017 | 14 | | NOTICE of Appearance by Roger M. Fleming on behalf of CENTER FOR BIOLOGICAL DIVERSITY, R. ZACK KLYVER (Fleming, Roger) (Entered: 04/06/2017) |
| 04/11/2017 | 15 | | NOTICE of Appearance by Davene Dashawn Walker on behalf of All Defendants (Walker, Davene) (Entered: 04/11/2017) |
| 04/12/2017 | 16 | | RESPONSE re 7 MOTION to Intervene filed by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE. (Attachments: # 1 Text of Proposed Order)(Wood, Jonathan) (Entered: 04/12/2017) |
| 04/12/2017 | 17 | | MOTION for Extension of Time to File Response/Reply as to 7 MOTION to Intervene by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE (Attachments: # 1 Text of Proposed Order)(Walker, Davene) (Entered: 04/12/2017) |
| 04/14/2017 | | | MINUTE ORDER: If proposed Intervenors object to Defendants' 17 Motion for Extension, the Court ORDERS that they shall file such opposition by April 19, 2017. Signed by Judge James E. Boasberg on 4/14/2017. (lcjeb1) (Entered: 04/14/2017) |
| 04/14/2017 | | | Set/Reset Deadlines: Opposition due by 4/19/2017. (nbn) (Entered: 04/17/2017) |
| 04/19/2017 | 18 | | Memorandum in opposition to re 17 MOTION for Extension of Time to File Response/Reply as to 7 MOTION to Intervene filed by CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, INC., |

| | | | |
|---|---|---|---|
| | | | R. ZACK KLYVER, NATURAL RESOURCES DEFENSE COUNCIL, INC.. (Desormeau, Katherine) (Entered: 04/19/2017) |
| 04/19/2017 | 19 | | REPLY to opposition to motion re 7 MOTION to Intervene filed by CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, INC., R. ZACK KLYVER, NATURAL RESOURCES DEFENSE COUNCIL, INC.. (Attachments: # 1 Declaration, # 2 Exhibit Amended Proposed Answer)(Desormeau, Katherine) (Entered: 04/19/2017) |
| 04/20/2017 | | | MINUTE ORDER: The Court ORDERS that Defendants shall file any Reply brief regarding their 17 Motion for Extension by April 24, 2017. Signed by Judge James E. Boasberg on 4/20/2017. (lcjeb1) (Entered: 04/20/2017) |
| 04/20/2017 | | | Set/Reset Deadlines: Reply due by 4/24/2017. (nbn) (Entered: 04/20/2017) |
| 04/24/2017 | 20 | | REPLY to opposition to motion re 17 MOTION for Extension of Time to File Response/Reply as to 7 MOTION to Intervene filed by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE. (Walker, Davene) (Entered: 04/24/2017) |
| 04/25/2017 | | | MINUTE ORDER: The Court ORDERS that Defendants' 17 Motion for Extension is GRANTED IN PART and DENIED IN PART; any Opposition to Intervenors' Motion to Intervene shall be due by May 10, 2017. In addition, if Intervenors' Motion is ultimately granted, the Court will ensure their ability to participate in any briefing of a dispositive motion. Signed by Judge James E. Boasberg on 4/25/2017. (lcjeb1) (Entered: 04/25/2017) |
| 04/25/2017 | | | Set/Reset Deadlines: Motion to Intervene shall be due by 5/10/2017. (nbn) (Entered: 04/25/2017) |
| 05/09/2017 | 21 | | MOTION to Stay *and Notice of Executive Orders and Cabinet Secretary Review* by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE (Walker, Davene) (Entered: 05/09/2017) |
| 05/09/2017 | | | MINUTE ORDER: The Court ORDERS that if Intervenors oppose the issuance of a stay before a ruling on their motion to intervene, they shall file such opposition by May 15, 2017. Signed by Judge James E. Boasberg on 5/9/2017. (lcjeb1) (Entered: 05/09/2017) |
| 05/09/2017 | | | Set/Reset Deadlines: Opposition due by 5/15/2017. (nbn) (Entered: 05/10/2017) |
| 05/11/2017 | 22 | | Memorandum in opposition to re 21 MOTION to Stay *and Notice of Executive Orders and Cabinet Secretary Review* filed by CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, INC., R. ZACK KLYVER, NATURAL RESOURCES DEFENSE COUNCIL, INC.. (Desormeau, Katherine) (Entered: 05/11/2017) |
| 05/12/2017 | | | MINUTE ORDER: The Court ORDERS that Defendants' 21 Motion to Stay is GRANTED, and the case is hereby STAYED until further Order of the Court. The Court believes that efficiency and a preservation of judicial resources militate in favor of addressing any motion to intervene after the stay is lifted, if such motion is still pressed. The Court will ensure that, upon any lifting of the stay, Intervenors will have a full opportunity to be heard on their motion and, if granted, the merits. The Court further ORDERS that the parties shall file a joint status report within 15 days of any recommendation following the designation review. Signed by Judge James E. Boasberg on 5/12/2017. (lcjeb1) (Entered: |

| | | | 05/12/2017) |
|---|---|---|---|
| 05/12/2017 | | | Case Stayed until further Order of the Court. (nbn) (Entered: 05/12/2017) |
| 09/08/2017 | 23 | | Joint STATUS REPORT by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE. (Walker, Davene) (Entered: 09/08/2017) |
| 09/11/2017 | | | MINUTE ORDER: The Court adopts the parties' 23 Report and ORDERS that the parties shall file a Joint Status Report on or before the earlier of November 7, 2017, or 14 days after the President issues his decision. Signed by Judge James E. Boasberg on 9/11/17. (lcjeb1) (Entered: 09/11/2017) |
| 09/11/2017 | | | Set/Reset Deadlines: Joint Status Report due by 11/7/2017. (nbn) (Entered: 09/12/2017) |
| 11/07/2017 | 24 | | Joint STATUS REPORT by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE. (Walker, Davene) (Entered: 11/07/2017) |
| 11/09/2017 | | | MINUTE ORDER: The Court ORDERS that the parties shall file a further joint status report by the earlier of January 8, 2018, or within 14 days of the President's issuing of a decision on the Northeast Canyons and Seamounts Marine National Monument. So ORDERED by Judge James E. Boasberg on 11/9/17. (lcjeb1) (Entered: 11/09/2017) |
| 11/09/2017 | | | Set/Reset Deadlines: Joint Status Report due by 1/8/2018. (nbn) (Entered: 11/09/2017) |
| 01/08/2018 | 25 | | Joint STATUS REPORT by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE. (Walker, Davene) (Entered: 01/08/2018) |
| 01/10/2018 | | | MINUTE ORDER: The Court ORDERS that the parties shall file a further joint status report by the earlier of March 9, 2018, or within 14 days of the President's issuing of a decision on the Northeast Canyons and Seamounts Marine National Monument. Further requests for extensions of the stay will require more detailed explanations of how the process is moving forward. o ORDERED by Judge James E. Boasberg on 1/10/18. (lcjeb1) (Entered: 01/10/2018) |
| 01/10/2018 | | | Set/Reset Deadlines: Joint Status Report due by 3/9/2018. (nbn) (Entered: 01/10/2018) |
| 03/09/2018 | 26 | | Joint STATUS REPORT by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE. (Walker, Davene) (Entered: 03/09/2018) |
| 03/10/2018 | 27 | | RESPONSE re 26 Status Report filed by CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, INC., R. ZACK KLYVER, NATURAL RESOURCES DEFENSE COUNCIL, INC.. (Desormeau, Katherine) (Entered: 03/10/2018) |
| 03/15/2018 | | | MINUTE ORDER: Per the parties' 26 Joint Status Report, the Court ORDERS that the stay is LIFTED and litigation may proceed. It also ORDERS that: 1) Defendants shall respond to the Motion to Intervene on or before March 19, 2018; 2) Defendants shall respond to the Complaint on or before April 16, 2018. |

| | | |
|---|---|---|
| | | So ORDERED by Judge James E. Boasberg on 3/15/2018. (lcjeb3) (Entered: 03/15/2018) |
| 03/15/2018 | | Set/Reset Deadlines: Response to the Motion to Intervene due by 3/19/2018. Response to the Complaint due by 4/16/2018. (nbn) (Entered: 03/16/2018) |
| 03/19/2018 | 28 | RESPONSE re 7 MOTION to Intervene filed by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE. (Walker, Davene) (Entered: 03/19/2018) |
| 03/20/2018 | | MINUTE ORDER: The Court ORDERS that: 1) Intervenors' 7 Motion to Intervene is GRANTED; and 2) Intervenors shall abide by the same timetables and Orders that apply to Government Defendants. So ORDERED by Judge James E. Boasberg on 3/20/18. (lcjeb1) (Entered: 03/20/2018) |
| 03/22/2018 | 29 | NOTICE of Appearance by Ian Fein on behalf of NATURAL RESOURCES DEFENSE COUNCIL, INC. (Fein, Ian) (Entered: 03/22/2018) |
| 03/22/2018 | 30 | NOTICE OF SUBSTITUTION OF COUNSEL by Jacqueline M Iwata on behalf of NATURAL RESOURCES DEFENSE COUNCIL, INC. Substituting for attorney Aaron Colangelo (Iwata, Jacqueline) (Entered: 03/22/2018) |
| 03/30/2018 | 31 | Consent MOTION for Briefing Schedule by CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, INC., R. ZACK KLYVER, NATURAL RESOURCES DEFENSE COUNCIL, INC. (Attachments: # 1 Text of Proposed Order)(Desormeau, Katherine) (Entered: 03/30/2018) |
| 04/02/2018 | | MINUTE ORDER ADOPTING Intervenors' 31 Motion for Briefing Schedule. The Court ORDERS that (1) any response by Defendants shall be filed on or before April 16, 2018; if Defendants choose to file a motion to dismiss, (1) Intervenors' response shall be filed on or before April 30, 2018; (2) Plaintiffs' opposition shall be filed on or before May 14, 2018; and (3) Defendants and Intervenors shall file any reply on or before June 4, 2018. So ORDERED by Judge James E. Boasberg on 4/2/18. (lcjeb1) (Entered: 04/02/2018) |
| 04/02/2018 | | Set/Reset Deadlines: Response due by 4/16/2018. Motion to Dismiss due by 4/30/2018. Response to Motion to Dismiss due by 5/14/2018. Reply to Motion to Dismiss due by 6/4/2018. (znbn) (Entered: 04/02/2018) |
| 04/16/2018 | 32 | MOTION to Dismiss *for Failure to State a Claim*, MOTION to Dismiss for Lack of Jurisdiction by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Walker, Davene) (Entered: 04/16/2018) |
| 04/30/2018 | 33 | RESPONSE re 32 MOTION to Dismiss *for Failure to State a Claim* MOTION to Dismiss for Lack of Jurisdiction filed by CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, INC., R. ZACK KLYVER, NATURAL RESOURCES DEFENSE COUNCIL, INC.. (Desormeau, Katherine) (Entered: 04/30/2018) |
| 05/04/2018 | 34 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Daniel E. Alberti, :Firm– McDermott Will & Emery, :Address– 275 Middlefield Road, Suite 100, Menlo Park, CA 94025. Phone No. – (650) 815–7419. Filing fee $ 100, receipt number 0090–5463068. Fee Status: Fee Paid. by Alison Rieser |

| | | | |
|---|---|---|---|
| | | | (Attachments: # 1 Declaration Declaration of Dan E. Alberti, # 2 Text of Proposed Order Proposed Order)(Bayles, Jessica) (Entered: 05/04/2018) |
| 05/04/2018 | 35 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– David Gacioch, :Firm– McDermott Will & Emery, :Address– 28 State Street, Boston, Massachusetts 02109. Phone No. – (617) 535–4000. Filing fee $ 100, receipt number 0090–5463099. Fee Status: Fee Paid. by Alison Rieser (Attachments: # 1 Declaration Declaration of David Gacioch, # 2 Text of Proposed Order Proposed Order)(Bayles, Jessica) (Entered: 05/04/2018) |
| 05/04/2018 | | | MINUTE ORDER GRANTING 34 Motion for Admission Pro Hac Vice of Daniel E. Alberti. So ORDERED by Judge James E. Boasberg on 5/4/18. (lcjeb1) (Entered: 05/04/2018) |
| 05/04/2018 | | | MINUTE ORDER GRANTING 35 Motion for Admission Pro Hac Vice of David Quinn Gacioch. So ORDERED by Judge James E. Boasberg on 5/4/18. (lcjeb1) (Entered: 05/04/2018) |
| 05/04/2018 | 36 | | Unopposed MOTION for Leave to File *AN AMICUS CURIAE BRIEF* by Alison Rieser, DONNA R CHRISTIE, JOSH EAGLE (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Bayles, Jessica) (Entered: 05/04/2018) |
| 05/04/2018 | 37 | | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by LAW PROFESSORS (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Baruch, Douglas) (Entered: 05/04/2018) |
| 05/04/2018 | | | Set/Reset Deadlines: Opposition due by 5/22/2018. (znbn) (Entered: 05/07/2018) |
| 05/07/2018 | | | MINUTE ORDER GRANTING 36 Motion for Leave to File Amicus Brief. So ORDERED by Judge James E. Boasberg on 5/7/18. (lcjeb1) (Entered: 05/07/2018) |
| 05/07/2018 | | | MINUTE ORDER GRANTING 37 Motion for Leave to File Amicus Brief. So ORDERED by Judge James E. Boasberg on 5/7/18. (lcjeb1) (Entered: 05/07/2018) |
| 05/07/2018 | 38 | | AMICUS BRIEF by DONNA R CHRISTIE, JOSH EAGLE, ALISON RIESER. (td) (Entered: 05/08/2018) |
| 05/07/2018 | 39 | | AMICUS BRIEF by LAW PROFESSORS. (td) (Entered: 05/08/2018) |
| 05/11/2018 | 40 | | Joint MOTION for Extension of Time to File Response/Reply as to 32 MOTION to Dismiss *for Failure to State a Claim* MOTION to Dismiss for Lack of Jurisdiction by WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE (Attachments: # 1 Text of Proposed Order)(Walker, Davene) (Entered: 05/11/2018) |
| 05/11/2018 | | | MINUTE ORDER GRANTING Defendants' 40 Motion for Extension of Time to File Response/Reply. The Court ORDERS that Defendants shall file a reply on or before June 12, 2018. So ORDERED by Judge James E. Boasberg on 5/11/18. (lcjeb1) (Entered: 05/11/2018) |
| 05/14/2018 | | | Set/Reset Deadlines: Reply to Dispositive Motions due by 6/12/2018. (lsj) (Entered: 05/14/2018) |

| 05/22/2018 | 41 | | Memorandum in opposition to re 32 MOTION to Dismiss *for Failure to State a Claim* MOTION to Dismiss for Lack of Jurisdiction filed by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE. (Wood, Jonathan) (Entered: 05/22/2018) |
|---|---|---|---|
| 05/23/2018 | 42 | | ERRATA by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE 41 Memorandum in Opposition, filed by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Wood, Jonathan) (Entered: 05/23/2018) |
| 06/12/2018 | 43 | | REPLY to opposition to motion re 32 MOTION to Dismiss *for Failure to State a Claim* MOTION to Dismiss for Lack of Jurisdiction filed by JANE DOE, BENJAMIN FRIEDMAN, WILBUR J. ROSS, JR., DONALD J. TRUMP, RYAN ZINKE. (Walker, Davene) (Entered: 06/12/2018) |
| 06/12/2018 | 44 | | REPLY to opposition to motion re 32 MOTION to Dismiss *for Failure to State a Claim* MOTION to Dismiss for Lack of Jurisdiction filed by CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION LAW FOUNDATION, INC., R. ZACK KLYVER, NATURAL RESOURCES DEFENSE COUNCIL, INC.. (Desormeau, Katherine) (Entered: 06/12/2018) |
| 08/16/2018 | 45 | | NOTICE of Change of Address by Jonathan Wood (Wood, Jonathan) (Entered: 08/16/2018) |
| 10/05/2018 | 46 | 54 | ORDER GRANTING 32 Motion to Dismiss. Signed by Judge James E. Boasberg on 10/5/2018. (lcjeb1) (Entered: 10/05/2018) |
| 10/05/2018 | 47 | 22 | MEMORANDUM OPINION re 46 Order on Motion to Dismiss. Signed by Judge James E. Boasberg on 10/5/2018. (lcjeb1) (Entered: 10/05/2018) |
| 10/23/2018 | 48 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to DONNA R. CHRISTIE, JOSH EAGLE, ALISON RIESER. Attorney Jessica Bayles terminated. (Bayles, Jessica) (Entered: 10/23/2018) |
| 12/03/2018 | 49 | 17 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 46 Order on Motion to Dismiss, Order on Motion to Dismiss/Lack of Jurisdiction, 47 Memorandum & Opinion by ATLANTIC OFFSHORE LOBSTERMEN'S ASSOCIATION, GARDEN STATE SEAFOOD ASSOCIATION, LONG ISLAND COMMERCIAL FISHING ASSOCIATION, MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, RHODE ISLAND FISHERMEN'S ALLIANCE. Filing fee $ 505, receipt number 0090−5818253. Fee Status: Fee Paid. Parties have been notified. (Wood, Jonathan) (Entered: 12/03/2018) |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, et al., | ) ) ) No. 1:17-cv-00406-JEB |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| WILBUR J. ROSS, JR., in his official capacity as Secretary of Department of Commerce, et al., | ) ) ) ) |
| Defendants, | ) ) |
| NATURAL RESOURCES DEFENSE COUNCIL, et al., | ) ) ) |
| Defendant-Intervenors. | ) |

**NOTICE OF APPEAL; CERTIFICATE STATING NO
TRANSCRIPT WILL BE ORDERED; REPRESENTATION STATEMENT**

TO THE ABOVE-REFERENCED COURT AND TO ALL PARTIES AND THEIR
RESPECTIVE ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs Massachusetts Lobstermen's
Association, Atlantic Offshore Lobstermen's Association, Long Island Commercial
Fishing Association, Garden State Seafood Association, and Rhode Island
Fishermen's Alliance hereby appeal to the United States Court of Appeals for the
District of Columbia Circuit from the order and opinion of this Court granting the
motion to dismiss entered on October 5, 2018 (Dkt. 46 & 47).

1

## Certificate Stating No Transcript Will Be Ordered

Pursuant to Federal Rule of Appellate Procedure 10(b)(1)(B), Plaintiffs Massachusetts Lobstermen's Association, et al., give notice that no transcript will be ordered for the present appeal.

## Representation Statement

Pursuant to Rule 12(b) of the Federal Rules of Appellate Procedure, all parties to the action are listed below along with the names, addresses, and telephone numbers of their respective counsel.

**Counsel for Plaintiffs Massachusetts Lobstermen's Association, Atlantic Offshore Lobstermen's Association, Long Island Commercial Fishing Association, Garden State Seafood Association, and Rhode Island Fishermen's Alliance:**

Jonathan Wood
Todd F. Gaziano
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201-5330
Telephone: (202) 888-6881

Joshua P. Thompson
Damien M. Schiff
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111

2

**Counsel for Federal Defendants Wilbur J. Ross, Jr., in his official capacity as Secretary of Department of Commerce; Benjamin Friedman, in his official capacity as Deputy Undersecretary for Operations for the National Oceanic and Atmospheric Association; Ryan Zinke, in his official capacity as Secretary of the Department of Interior; Donald J. Trump, in his official capacity as President of the United States; and Jane Doe, in her official capacity as Chairman for the Council on Environmental Quality:**

Jeffrey H. Wood
Acting Assistant Attorney General
Davene D. Walker
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 353-9213


**Counsel for Defendant-Intervenor Natural Resources Defense Council:**

Katherine Desormeau
Ian Fein
Michael E. Wall
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, California 94104
Telephone: (415) 875-6158

Jacqueline M. Iwata
Natural Resources Defense Council
1152 15th Street, N.W., Suite 300
Washington, DC 20005
Telephone: (202) 289-2377

Bradford H. Sewell
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, New York 10011
Telephone: (212) 727-4507

**Counsel for Defendant-Intervenor Conservation Law Foundation:**

Peter Shelley
Conservation Law Foundation
62 Summer Street
Boston, Massachusetts 02110
Telephone: (617) 850-1754

**Counsel for Defendant-Intervenors Center for Biological Diversity and R. Zack Klyver:**

Roger Fleming
Earthjustice
1625 Massachusetts Ave., N.W.
Washington, DC 20036
Telephone: (202) 667-4500

      DATED: December 3, 2018.

          Respectfully submitted:

           /s Jonathan Wood

JOSHUA P. THOMPSON      JONATHAN WOOD*
Cal. Bar No. 250955         D.C. Bar No. 1045015
E-mail: jpt@pacificlegal.org    E-mail: jw@pacificlegal.org
DAMIEN M. SCHIFF*       TODD F. GAZIANO*
Cal. Bar No. 235101         Tex. Bar No. 07742200
E-mail: dms@pacificlegal.org    E-mail: tfg@pacificlegal.org
Pacific Legal Foundation     Pacific Legal Foundation
930 G Street             3100 Clarendon Blvd., Suite 610
Sacramento, California 95814   Arlington, Virginia 22201
Telephone: (916) 419-7111    Telephone: (202) 888-6881

*Pro Hac Vice

         *Attorneys for Plaintiffs*

4

## Certificate of Service

I hereby certify that on December 3, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Bradford H. Sewell<br>bsewell@nrdc.org | Douglas W. Baruch<br>douglas.baruch@friedfrank.com |
| Michael E. Wall<br>mwall@nrdc.org | Ian Fein<br>ifein@nrdc.org |
| Katherine K. Desormeau<br>kdesormeau@nrdc.org | Jacqueline M. Iwata<br>jiwata@nrdc.org |
| Peter Shelley<br>pshelley@clf.org | Davene Dashawn Walker<br>davene.walker@usdoj.gov |
| Roger M. Fleming<br>rfleming@earthjustice.org | Daniel E. Alberti<br>dalberti@mwe.com |

I further certify that one of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participant:

David Q. Gacioch
McDermott, Will & Emery LLP
28 State Street
Boston, MA 02109

s/ Jonathan Wood
JONATHAN WOOD

5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**MASSACHUSETTS LOBSTERMEN'S
ASSOCIATION,** *et al.***,**

     **Plaintiffs,**

          **v.**

**WILBUR J. ROSS, Jr.,** *et al.***,**

     **Defendants.**

**Civil Action No. 17-406 (JEB)**

---

## MEMORANDUM OPINION

In 1905, Teddy Roosevelt wrote that "there can be nothing in the world more beautiful"

than the natural wonders of the United States, and "our people should see to it that they are

preserved for their children and their children's children forever." Outdoor Pastimes of An

American Hunter at 317 (1905). Roosevelt was talking, of course, about those legendary sites

that most Americans know: Yosemite Valley, the Canyon of Yellowstone, and the Grand

Canyon.

But he might have been talking about a less well-known — and only more recently

appreciated — natural wonder: the Canyons and Seamounts of the Northwestern Atlantic Ocean.

Like the landmarks the twenty-sixth President had in mind, the Canyons and Seamounts are a

"region of great abundance and diversity as well as stark geographic relief." ECF No. 1

(Compl.), Exh. 4 (Proclamation of Northeast Canyons and Seamounts Marine National

Monument) at 1. Dating back 100 million years — much older than Yosemite and Yellowstone

— they are home to "vulnerable ecological communities" and "vibrant ecosystems." Id. at 1–2.

1

And, as was true of the hallowed grounds on which Roosevelt waxed poetic, "[m]uch remains to be discovered about these unique, isolated environments." Id. at 4.

More than a century after Roosevelt had left office, but in reliance on a conservation statute passed during that time, President Barack Obama proclaimed the Canyons and Seamounts a National Monument. Motivated by the area's "unique ecological resources that have long been the subject of scientific interest," the President sought to protect it for future use and study. Id. at 1.

The question before the Court in this case is whether he had the power do so. More specifically, does the Antiquities Act give the President the authority to designate this monument? Plaintiffs are various commercial-fishing associations who argue that it does not for three reasons: first, because the submerged lands of the Canyons and Seamounts are not "lands" under the Antiquities Act; second, because the federal government does not "control" the lands on which the Canyons and Seamounts lie; and third, because the amount of land reserved as part of the Monument is not the smallest compatible with its management. The Government, backed by intervening conservation organizations and two groups of law professor *amici*, disagrees entirely.

The Court concludes that, just as President Roosevelt had the authority to establish the Grand Canyon National Monument in 1908, see Cameron v. United States, 252 U.S. 450 (1920), so President Obama could establish the Canyons and Seamounts Monument in 2016. It therefore grants Defendants' Motion to Dismiss.

## I.    Background

The Court begins with a brief discussion of the Antiquities Act and the establishment of the Monument before explaining the procedural history of the case.

A. The Antiquities Act

During the nascency of America's efforts to protect her cultural and scientific heritage, Congress passed the Antiquities Act of 1906. See Pub. L. No. 59–209, 34 Stat. 225 (codified at 54 U.S.C. § 320301 *et seq.*). Proposed initially to address the loss of archaeological artifacts in the West, the Act has played a central role in presidents' modern conservation efforts. See Bruce Babbitt, *Introduction*, in The Antiquities Act of 1906 (Ronald F. Lee, 2001 Electronic Edition). Presidents have declared, in all, 157 national monuments, protecting everything from the natural marvels of the Grand Canyon and Death Valley to Native American artifacts in El Morro and Chaco Canyon. See Carol Hardy Vincent & Laura A. Hanson, Cong. Research Serv., Executive Order for Review of National Monuments: Background and Data at 1 (2017); see also National Park Service, List of National Monuments, https://www.nps.gov/archeology/sites/antiqu ities/monumentslist.htm (last updated Sept. 21, 2018).

The Act works in three parts. First, it authorizes the President, in his discretion, to declare "objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a). Second, it empowers her to "reserve parcels of land as a part of the national monuments." Id. § 320301(b). Any parcel of land she reserves must be "confined to the smallest area compatible with the proper care and management of the objects to be protected." Id. Third, it allows privately held land to be voluntarily given to the federal government if the land is "necessary for the proper care and management" of the national monument. Id. § 320301(c). Together, those provisions give the Executive substantial, though not unlimited, discretion to designate American lands as national monuments.

3

B.  The Northeast Canyons and Seamounts Marine National Monument

This case concerns the Northeast Canyons and Seamounts Marine National Monument, proclaimed by President Obama in 2016.  The Monument seeks to protect several underwater canyons and mountains, and the ecosystems around them, situated about 130 miles off the New England coast.  See Compl., ¶¶ 2, 54–55.  Covering in total about 4,913 square miles, the Monument consists of two non-contiguous units that lie within an area of the ocean known as the U.S. Exclusive Economic Zone.  See Proclamation at 2–3.  The first covers three underwater canyons that "start at the edge of the continental shelf and drop thousands of meters to the ocean floor."  Compl., ¶ 54.  According to the Proclamation, whose scientific conclusions are (as yet) unchallenged, the canyons are home to a diverse range of marine life, including corals, squid, octopus, and several species of endangered whales.  Id.; see also Proclamation at 2–3.  Because of the oceanographic features of the canyons, they are also home to highly migratory species like tuna, billfish, and sharks.  See Proclamation at 2–3.

The second unit covers four undersea mountains known as seamounts.  See Compl., ¶ 55.  Formed up to 100 million years ago by magma erupting from the seafloor, the seamounts are now extinct volcanoes that are thousands of meters tall.  See Proclamation at 3.  According to the Proclamation, the geology of the seamounts — namely, their steep and complex topography — results in a "a constant supply of plankton and nutrients to animals that inhabit their sides" and causes an "upwelling of nutrient-rich waters toward the ocean surface."  Id.  The seamounts thus support "highly diverse ecological communities," serving as homes to "many rare and endemic species, several of which are new to science and not known to live anywhere else on Earth."  Id. at 3–4.

4

Together, the geological formations of the canyons and seamounts allow a wide range of unique and rare species to flourish.  As such, the formations and the ecosystems surrounding them "have long been of intense scientific interest."  Id. at 4.  Although a range of scientists has studied the area using research vessels, submarines, and remotely piloted vehicles, "[m]uch remains to be discovered about these unique, isolated environments and their geological, ecological, and biological resources."  Id.

In proclaiming the area to be a national monument, President Obama directed the Executive Branch to take several practical steps to conserve the area's resources.  First, he directed the Secretaries of Commerce and Interior to develop plans within three years for "proper care and management" of the canyons and seamounts.  Id. at 6.  Second, he required the Secretaries to prohibit oil and gas exploration and most commercial fishing within the Monument.  Id. at 7–8.  Third, he directed the Secretaries to encourage scientific and research activities as consistent with the Proclamation.  Id. at 8–9.

C.  This Lawsuit

On March 7, 2017, several commercial-fishing associations, including the Massachusetts Lobstermen's Association, filed this lawsuit.  Claiming injury from the restrictions on commercial fishing, Plaintiffs seek declaratory and injunctive relief against the President, the Secretaries of Commerce and Interior, and the Chairman of the Council on Environmental Quality.  See Compl., ¶ 4.  Invoking the Court's jurisdiction to conduct non-statutory review of *ultra vires* executive action, see Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996), they argue that the President lacked authority under the Antiquities Act to declare this Monument.  See Compl., ¶¶ 3–4.  The Government has now filed a Motion to Dismiss, backed

by several intervening conservation organizations and two groups of law professor *amici*. The

matter is now ripe for the Court's consideration.

## II.    Legal Standard

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's

factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be

derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C.

Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)); see also

Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005). The Court need

not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference

unsupported by the facts set forth in the Complaint. See Trudeau v. FTC, 456 F.3d 178, 193

(D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a

complaint fails "to state a claim upon which relief can be granted." Although "detailed factual

allegations" are not necessary to withstand a Rule 12(b)(6) motion, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted). For a plaintiff to survive

a 12(b)(6) motion, the facts alleged in the complaint "must be enough to raise a right to relief

above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).

The standard to survive a motion to dismiss under Rule 12(b)(1) is less forgiving. Under

this Rule, Plaintiffs bear the burden of proving that the Court has subject-matter jurisdiction to

hear their claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). A court also

has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional

authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C.

6

2001). For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).

## III.    Analysis

The Government seeks dismissal under Rules 12(b)(1) and 12(b)(6) on the grounds that the case is not judicially reviewable and that the President did not exceed his statutory authority. The Court agrees with the latter but not the former.

### A.    Reviewability

Before diving into the merits of the case, the Court must determine if Plaintiffs' claims are judicially reviewable. In other words, does the Court have any role to play here? Despite a raft of precedent holding otherwise, the Government initially suggests that it does not. Defendants say that the Antiquities Act commits national-monument determinations to the President's sole discretion, and, as such, those determinations cannot be reviewed. See ECF No. 32 (Def. MTD) at 7–8. The Court disagrees. Three times the Supreme Court has reviewed the legality of a President's proclamation of a national monument. See United States v. California, 436 U.S. 32–33 (1978) (Channel Islands National Monument); Cappaert v. United States, 426 U.S. 128, 141–42 (1976) (Death Valley National Monument); Cameron, 252 U.S. at 455–56 (Grand Canyon National Monument). Citing those precedents, the D.C. Circuit has thus explained that "review is available to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority." Mountain States Legal Found. v. Bush, 306 F.3d 1132, 1136 (D.C. Cir. 2002); accord Tulare County v. Bush, 306 F.3d 1138, 1141 (D.C. Cir. 2002); see also Chamber of Commerce, 74 F.3d

7

at 1331–32 (explaining basis for review of statutory-authority questions). Because Plaintiffs'

claims assert that the President exceeded his statutory authority under the Antiquities Act — *i.e.*,

that the Proclamation was *ultra vires* — they are generally reviewable.

Still, hard questions remain about the <u>scope</u> of review of Plaintiffs' claims. In that

regard, two categories of *ultra vires* claims should be distinguished. First, there are those that

can be judged on the face of the proclamation. The plaintiffs in <u>Cappaert</u> made such a claim

when they argued that the Devil's Pool in Death Valley was not an "object[] of historic or

scientific interest" because it was not archaeological in nature. <u>See</u> 426 U.S. at 141–42. So did

the plaintiff in <u>California</u> when it contended that the federal government did not "control[]" the

submerged lands off the coast of the Channel Islands. <u>See</u> 436 U.S. at 36. Judicial review of

such claims resembles the sort of statutory interpretation with which courts are familiar. <u>See</u> <u>Aid</u>

<u>Ass'n for Lutherans v. U.S. Postal Serv.</u>, 321 F.3d 1166, 1174–75 (D.C. Cir. 2003).

The second category requires some factual development. The plaintiffs in <u>Mountain</u>

<u>States</u> and <u>Tulare County</u> brought such claims when they asserted that the national monuments,

as a factual matter, "lack[ed] scientific or historical value." <u>Tulare County</u>, 306 F.3d at 1142.

The same is true of those plaintiffs' claims that the monuments' size was not "the smallest area

compatible with the proper care and management of the objects to be protected." <u>Id.</u> Courts

cannot adjudicate such claims without considering the facts underlying the President's

determination. <u>See</u> <u>Mountain States</u>, 306 F.3d at 1134. The availability of judicial review of this

category of claims thus stands on shakier ground. <u>Id.</u> at 1133 (declining to decide "the

availability or scope of judicial review" of such claims because doing so was unnecessary to

resolve the case); <u>see also</u> <u>Dalton v. Specter</u>, 511 U.S. 462, 474 (1994). What is clear about this

category, however, is that review would be available only if the plaintiff were to offer plausible

8

and detailed factual allegations that the President acted beyond the boundaries of authority that Congress set. See Mountain States, 306 F.3d at 1137 (emphasizing that courts should be "necessarily sensitive to pleading requirements where, as here, [they are] asked to review the President's actions under a statute that confers very broad discretion on the President and separation of powers concerns are presented").

The Lobstermen assert both types of claims here. Their allegations that the submerged lands of the Exclusive Economic Zone are not "land" under the Antiquities Acts and are not "controlled" by the federal government fall into the first category. The Court can undoubtedly review these claims and decide whether the President acted within the bounds of his authority. Plaintiffs' allegations that the land reserved as part of the monument is not the "smallest area compatible" with monument management, however, lie in the second category. While the availability and scope of review of such claims are unsettled, the Court need not venture into those uncharted waters because it concludes that Plaintiffs have not offered sufficient factual allegations to succeed.

As a quick aside, under either circumstance, the Court's rejection of Plaintiffs' argument results in dismissal under Rule 12(b)(1), rather than Rule 12(b)(6). In concluding that Plaintiffs failed to demonstrate that the President acted outside his statutory authority, the Court holds, at least as a formal matter, that Plaintiffs' claims are not subject to further judicial review. Such a determination, as best the Court can tell, is jurisdictional. See Griffith v. Fed. Labor Relations Auth., 842 F.2d 487, 494 (D.C. Cir. 1988) (concluding that district court "was without jurisdiction to review" plaintiff's claims because government acted within its statutory authority). Regardless, whether properly deemed a dismissal under Rule 12(b)(1) or Rule 12(b)(6), the Court's analysis would be the same.

9

With that preface, the Court moves on to the claims themselves.

B. Lands

The Lobstermen first contend that the Northeast Canyons and Seamounts Marine National Monument is *per se* invalid because it lies entirely in the ocean. The Antiquities Act authorizes monuments on "lands" controlled by the federal government, they say, and the Atlantic Ocean is obviously not "land." See ECF No. 41 (Pl. Opp.) at 11–14. While the argument admittedly has some surface appeal, it is buffeted by the strong winds of Supreme Court precedent, executive practice, and ordinary meaning. The Court examines these and one last issue sequentially.

1. *Precedent*

Take precedent first. The Supreme Court has thrice concluded that the Antiquities Act does reach submerged lands and the water associated with them. In Cappaert, the Court addressed a dispute about a pool of water in the Devil's Hole, a cavern near Death Valley. See 426 U.S. at 131. After some discussion, it concluded that the pool and groundwater beneath it were properly reserved under the Antiquities Act as part of the Death Valley National Monument. Id. at 141–42.

The Court next addressed the matter in California, 436 U.S. 32. There, it considered whether California or the federal government had dominion "over the submerged lands and waters within the Channels Islands National Monument." Id. at 33. It began by emphasizing that "[t]here can be no serious question . . . that the President in 1949 had power under the Antiquities Act to reserve the submerged lands and waters . . . as a national monument." Id. at 36. It explained that "[a]lthough the Antiquities Act refers to 'lands,' this Court has recognized that it also authorizes the reservation of waters located on or over federal lands." Id. n.9 (citing

10

Cappaert, 426 U.S. at 138–42).  The Court went on to conclude for other reasons that title to the lands had subsequently passed to California.  Id. at 37.

Finally, just over a dozen years ago, the Court considered how the Antiquities Act applies to submerged lands in Alaska v. United States, 545 U.S. 75 (2005).  The relevant issue in that case, like in California, was whether Alaska or the federal government had title to the submerged lands in Glacier Bay off the coast of Alaska.  Id. at 78.  The Court concluded that the federal government had title, in necessary part because those submerged lands were lawfully part of the Glacier Bay National Monument.  Id. at 101–02.  The Court separately emphasized that "[i]t is clear . . . that the Antiquities Act empowers the President to reserve submerged lands."  Id. at 103 (citing California, 436 U.S. at 36).  In all three opinions, then, the Court affirmed that the Antiquities Act authorizes presidents to declare submerged lands like the canyons and seamounts as national monuments.

Not so fast, Plaintiffs say: those opinions' discussions of the Antiquities Act, they believe, are *dicta*.  See Pl. Opp. at 13 n.4.  The Court disagrees, at least as to Alaska.  In that case, the Supreme Court applied a two-part test to determine whether the federal government had title to the submerged lands: first, it asked whether the federal government had properly reserved the land; second, it inquired whether the federal government had demonstrated an intent to defeat the state's title to the land.  While the Supreme Court did not rely on the monument designation to demonstrate the federal government's intent to defeat Alaska's title (step two), it affirmatively relied on the designation to demonstrate that the federal government had reserved the lands originally (step one).  See 545 U.S. at 100–02.  Indeed, the Court went out of its way to emphasize that its conclusion to that effect was "a necessary part of the reasoning."  Id. at 101.  Its decision that the submerged lands in Glacier Bay were indeed lands under the Antiquities Act

11

was thus a holding, not *dictum*. In any event, "[c]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." NRDC v. NRC, 216 F.3d 1180, 1189 (D.C. Cir. 2000) (quoting United States v. Oakar, 111 F.3d 146, 153 (D.C. Cir. 1997)). This Court is loath to hold otherwise and thus sticks with the Supreme Court's admonition that "the Antiquities Act empowers the President to reserve submerged lands." Alaska, 545 U.S. at 103.

2.  *Practice*

In light of those decisions, it should come as no surprise that past presidents have frequently reserved submerged lands as national monuments. In addition to the Devil's Hole, Channel Islands, and Glacier Bay monuments, presidents have declared, among others, the Fort Jefferson National Monument off the coast of Florida, see 49 Stat. 3430 (1935), the Buck Island Reef National Monument off the Virgin Islands, see 76 Stat. 1441 (1961), and the Papahānaumokuākea Marine National Monument off the coast of Hawaii. See 72 Fed. Reg. 10,031 (Feb. 28, 2007); see also Administration of Coral Reef Resources in the Northwest Hawaiian Islands, 24 Op. O.L.C. 183, 186–200 (2000) (Office of Legal Counsel opinion explaining Executive understanding that Antiquities Act extends to submerged lands in ocean). That history supports interpreting the Act to reach submerged lands. See Zemel v. Rusk, 381 U.S. 1, 11 & n.8 (1965). Accentuating the persuasiveness of the Executive's longstanding interpretation, Congress recodified the Antiquities Act with minor changes in 2014 but without modifying the Act's reach. See N. Haven Bd. of Ed. v. Bell, 456 U.S. 512, 535 (1982) (explaining that Congress's acquiescence to agency's construction in amending statute suggests agency has "correctly discerned" the "legislative intent") (quoting United States v. Rutherford, 442 U.S. 544, 554 n.10 (1979)).

12

Plaintiffs contend that this executive practice and the precedents sustaining it do not control the circumstances of this case. They argue, in short, that those past monuments should be distinguished because they are not confined to submerged lands, but also include some non-submerged lands. See Pl. Opp. at 25–26. Why this would make a difference for the purpose of construing the word "land" in the Antiquities Act escapes the Court; it apparently escapes Plaintiffs as well, for their Opposition fails to explain the salience of the distinction. What seems inescapable is that if the submerged lands in Glacier Bay are "lands" under the Antiquities Act, so are the submerged canyons and seamounts in the Atlantic Ocean.

3.  *Ordinary Meaning*

What this Court has already said should be enough to settle the matter of defining lands under the Antiquities Act. A few brief words are nonetheless warranted in response to Plaintiffs' argument that "[t]he ordinary meaning of 'land' excludes the ocean." Pl. Opp. at 11. In support of that assertion, they cite several definitions of "land" from dictionaries published in the Rooseveltian era that define it in opposition to "ocean." Id. at 12 (citing, *e.g.*, Webster's New International Dictionary (1st ed. 1909)). Of course, it is true that the world is roughly divided up into dry land, on the one hand, and ocean on the other. But what about that part of the earth that lies beneath the seas? It is not dry land, to be sure; yet ordinary parlance would seem to deem places like the ocean floor and the beds of lakes and streams land. As it turns out, the dictionaries Plaintiffs cite would agree. Webster's First includes "land under water" as a proper use of the word "land." Webster's New International Dictionary at 1209. Black's Law Dictionary likewise defines land as "any ground soil, or earth whatsoever," including "everything attached to it . . . [such] as trees, herbage, and water." Black's Law Dictionary at

13

684 (1st ed. 1891).  If that were not enough, the Supreme Court has offered the following

commentary directly on point:

> [T]he word "lands" includes everything which the land carries or
> which stands upon it, whether it be natural timber, artificial
> structures, or <u>water</u>, and that an ordinary grant of land by metes and
> bounds carries all pools and ponds, non-navigable rivers, and waters
> of every description by which such lands, or any portion of them,
> may be submerged, since, as was said by the court in <u>Queen v. Leeds
> & L. Canal Co.</u> 7 Ad. & El. 671, 685: "Lands are not the less land
> for being <u>covered with water</u>."

<u>Ill. Cent. R.R. Co. v. Chicago</u>, 176 U.S. 646, 660 (1900) (emphases added).  That should settle it:

The Antiquities Act reaches lands both dry and wet.

### 4.  *National Marine Sanctuaries Act*

But wait.  Plaintiffs offer one last argument why the Antiquities Act does not reach

submerged lands in the oceans.  They say that such a reading would conflict with the National

Marine Sanctuaries Act, which gives the Executive Branch the authority to designate certain

areas of the marine environment as "national marine sanctuaries" and to issue regulations

protecting those areas.  <u>See</u> Pl. Opp. at 26–33 (citing 16 U.S.C. § 1431 *et seq.*).  The Court

understands them to be making two separate arguments in that regard.  First, they say that the

Sanctuaries Act impliedly repealed the Antiquities Act, at least as it applied to the oceans.  <u>Id.</u> at

26.  Second, they posit that Congress's decision to pass the Sanctuaries Act sheds light on its

understanding that oceans are excluded from the reach of the Antiquities Act.  <u>Id.</u> at 26–33.

Neither argument, so to speak, holds water.

Take the implied-repeal contention first.  It is axiomatic that "repeals by implication are

not favored."  <u>Watt v. Alaska</u>, 451 U.S. 259, 267 (1981).  Courts do not "infer a statutory repeal

'unless the later statute expressly contradicts the original act' or unless such a construction 'is

absolutely necessary in order that the words of the later statute shall have any meaning at all.'"

14

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 662 (2007) (formatting

modified) (quoting Traynor v. Turnage, 485 U.S. 535, 548 (1988)).  Plaintiffs, moreover, do not

attempt to make the kind of showing required for an implied-repeal argument.  And for good

reason.  Not only does the Sanctuaries Act fail to mention the Antiquities Act, but it also

expressly provides that it is intended to "complement[] existing regulatory authorities."  16

U.S.C. § 1431(b)(2).

The post-enactment-intent argument similarly provides the Lobstermen's boat little

headway.  It is true, as they note, that "the meaning of one statute may be affected by other Acts,

particularly where Congress has spoken subsequently and more specifically to the topic at hand."

Pl. Opp. at 29 (quoting FDA v. Brown & Williamson, 529 U.S. 120, 133 (2000)).  But

subsequent acts may also "provid[e] overlapping sources of protection," intended to complement

earlier enactments.  See Mountain States, 306 F.3d at 1138; see also United States v. Borden Co.,

308 U.S. 188, 198 (1939) (statutes "may be merely affirmative, or cumulative, or auxiliary").

Such was the case in Mountain States.  There, the plaintiffs argued that "the specific provisions

of the numerous environmental statutes adopted in the years following enactment of the

Antiquities Act," including the Endangered Species Act and the Wilderness Act, demonstrated

that Congress did not intend for the Antiquities Act to address similar environmental values.  See

Brief for Appellant, Mountain States, 306 F.3d 1132 (No. 01-5421).  They believed that those

more specific enactments provided "the sole mechanisms by which certain environmental values

were to be protected."  Id.  The Court disagreed, explaining that the argument "misconceives

federal laws as not providing overlapping sources of protection."  306 F.3d at 1138.  In other

words, the subsequent environmental statutes provided the Executive Branch with a targeted way

of addressing similar environmental concerns — the fact that Congress subsequently expanded

15

the Executive's tools to protect the environment, however, did not invalidate Congress's prior

authorization to the Executive to designate national monuments.  Id.

The Court concludes that, as in Mountain States, the Antiquities Act's reach is unaffected

by subsequent statutory enactments such as the Sanctuaries Act.  As the Court interprets them,

both Acts address environmental conservation in the oceans.  Yet they do so in different ways

and to different ends.  Begin with the purposes of the Acts.  The Antiquities Act is entirely

focused on preservation.  The Sanctuaries Act, on the other hand, addresses a broader set of

values, including "recreation[]" and the "public and private uses of the [ocean] resources."  16

U.S.C. §§ 1431(a)(2), 1431(b)(6).  In line with their different purposes, the Acts' regulatory tools

also vary.  The Antiquities Act provides presidents with a blunt tool aimed at preserving objects

of scientific or historic value.  The Sanctuaries Act, on the other hand, offers a targeted approach,

incorporating feedback from a host of stakeholders and reflecting more tailored conservation

measures.  See 16 U.S.C. § 1434(a)(5) (outlining procedures and explaining that commercial

fishing, among other private uses, generally permitted).  Contrary to Plaintiffs' argument, then,

the Court's interpretation of the Antiquities Act does not render the Sanctuaries Act redundant.

Far from it.  Like the Endangered Species Act in Mountain States, the Sanctuaries Act gives the

President an important, but more targeted, implement to achieve an overlapping, but not

identical, set of goals.

Considered in the broader context of Congressional involvement in marine conservation,

Plaintiffs' post-enactment-intent argument faces another problem.  When Congress passed the

Sanctuaries Act in 1972, it acted on a backdrop of presidential practice establishing national

monuments on submerged lands, aimed at conserving natural resources.  See e.g., 53 Stat. 2534

(1939) (Glacier Bay Expansion); 76 Stat. 1441 (1961) (Buck Island Reef).  If the later Congress

16

37

had a narrower understanding of the Antiquities Act's reach, as Plaintiffs contend, it might be expected to have expressly amended or repealed the Act when it passed the Sanctuaries Act. It did not do so. See *supra* at 12–13. The natural inference from Congress's silence is not that it intended to change the Antiquities Act's reach, but that it intended to keep it the same.

These circumstances, among others, also show why Plaintiffs' reliance on FDA v. Brown & Williamson Tobacco, 529 U.S. at 133, is misplaced. Much simplified, the question in that case was whether the FDA could regulate tobacco. Id. In concluding that it could not, the Supreme Court emphasized that the FDA had made "consistent and repeated statements that it lacked authority" to regulate tobacco, id. at 144, and Congress had subsequently passed several more specific statutes regulating tobacco, thereby "ratify[ing] the FDA's prior position that it lacks jurisdiction." Id. at 158. This case is different. Here, as mentioned, Congress enacted the Sanctuaries Act against the backdrop of the Executive's position that the Antiquities Act reaches submerged lands. So, if the Sanctuaries Act ratified anything, it was the Executive's understanding that the Act reaches certain submerged lands.

Finally, while on the subject of later Congresses' intents, it is worth emphasizing again that the legislature recodified the Antiquities Act with several small amendments in 2014 without altering its scope. By that point, more presidents had declared marine national monuments, and several of those monuments had been sustained by the Supreme Court. See *supra* at 10–13. The response from Congress? Silence. Had later Congresses understood the Antiquities Act not to reach submerged lands in the oceans or the Sanctuaries Act to alter the Antiquities Act, as Plaintiffs contend, one might expect them to have effectuated that understanding somewhere in the U.S. Code.

\*      \*      \*

17

The Court, accordingly, rejects Plaintiffs' argument that this Monument exceeds the President's authority under the Antiquities Act because it lies entirely beneath the waves.

### C. Control

With plenty of bait left, the Lobstermen next argue that the Monument is invalid because the Government does not adequately "control" the Exclusive Economic Zone, the sector of the ocean where the Monument lies. Recall that presidents may only declare national monuments on land "owned or controlled by the Federal Government." 54 U.S.C. § 320301(a). Plaintiffs contend that the Antiquities Act requires the federal government to maintain "complete" control over the area, and that the Government lacks such control over the EEZ. See Pl. Opp. at 14. This argument hauls in no more catch than Plaintiffs' prior one about submerged lands. The Court starts by explaining why it disagrees with Plaintiffs' interpretation of "control" before articulating why it concludes that the federal government adequately controls the EEZ for purposes of the Act.

### 1. *"Complete" Control*

Plaintiffs contend that the phrase "lands owned or controlled by the federal government" should be interpreted to mean "lands owned or completely controlled by the federal government." See Pl. Opp. at 14–15. The Court cannot concur. The ordinary meaning of the word, backed by statutory context and Supreme Court precedent, demonstrates that Congress meant something less than complete control.

The Court starts with the plain meaning of the word "control." Relying on definitions from Webster's First Dictionary, Plaintiffs argue that "control" means "to exercise complete dominion." Id. at 14. Webster's First defines control as follows: "To exercise restraining or directing influence over; to dominate; regulate; hence, to hold from action; to curb; subject;

overpower." Webster's New International Dictionary at 490. None of the definitions they cite supports Plaintiffs' understanding. Most of the definitions, including "to exercise directing influence, regulate, hold from action, curb," clearly indicate something less than absolute control. But even the most favorable definitions for Plaintiffs — *e.g.*, "to dominate and overpower" — arguably suggest something less than complete control. Consider a simple example: If a technology investor said that IBM "dominated" the market for laptop computers, one would not understand her to mean that it "exercised complete dominion" over the market. Rather, she would be understood to say that IBM is the unrivaled leader in the market, though other companies continue to compete with it. Replace dominate with control and the meaning remains largely the same. Far from supporting Plaintiffs' understanding of control, the dictionary definitions thus suggest a broader interpretation of the term.

In response, the Lobstermen invoke several canons of interpretation. They first raise *noscitur a sociis* — the rule that "a word is known by the company it keeps." Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995). Because "controlled" is grouped with the word "owned," Plaintiffs argue it should refer to the same degree of control as ownership. See Pl. Opp. at 15. The Court is unpersuaded. Rejecting a nearly identical contention, the Supreme Court has explained that "[t]he argument seems to assume that pairing a broad statutory term with a narrow one shrinks the broad one, but there is no such general usage." S.D. Warren Co. v. Maine Bd. of Environmental Protection, 547 U.S. 370, 379 (2006); see also Graham County Soil & Water Conserv. Dist. v. United States ex rel. Wilson, 559 U.S. 280, 288–89 (2010) ("[T]hree items . . . [are] too few and too disparate to qualify as string of statutory terms.") (internal quotation marks and citation omitted). Just as the Supreme Court refused to apply *noscitur a sociis* to narrow the broader term in a two-term list, S.D. Warren, 547 U.S. at 379–81, this Court rejects application

19

of the canon here.  Indeed, the Lobstermen's *noscitur a sociis* argument is weaker even than the one rejected in S.D. Warren.  There at least, the two-term list was conjunctive — *i.e.*, separated by an "and."  Id. at 379.  Here, Congress separated ownership and control with the word "or," whose use "is almost always disjunctive, that is, the words it connects are to be given separate meanings."  Loughrin v. United States, 134 S. Ct. 2384, 2390 (2014) (quoting United States v. Woods, 571 U.S. 31, 45 (2013)).  Just so here, for control and ownership "are distinct concepts." Dole Food Co. v. Patrickson, 538 U.S. 468, 477 (2003).  A statutory canon focused on "identifying a common trait that links all the words" is thus particularly inapplicable.  See Yates v. United States, 135 S. Ct. 1074, 1097 (2015) (Kagan, J., dissenting).

Not dissuaded, Plaintiffs next invoke the rule against surplusage.  See Pl. Op. at 15.  They say that a broader interpretation of the term "control" — to mean something less than absolute dominion — would render irrelevant the term "owned."  Id.  But Plaintiffs' interpretation does not resolve any surplusage problem.  Assuming "control" requires "the same degree of control" as ownership, see Pl. Opp at 15, the term "ownership" is equally irrelevant as it would be under a broader understanding of "control."  The Court thus rejects the surplusage argument.  See Bruesewitz v. Wyeth LLC, 562 U.S. 223, 236 (2011) (rejecting surplusage argument that did not resolve surplusage problem).

Somewhat more interesting, though ultimately just as unpersuasive, are Plaintiffs' legislative-history arguments.  See Pl. Opp. at 15–17.  In that regard, they note that earlier versions of the Antiquities Act used the phrase "public lands," rather than "lands owned or controlled by the United States."  Compare 54 U.S.C. § 320301(a) with S. 5603, 58th Cong. (1904).  Plaintiffs contend that the change was precipitated by one senator's remark in a subcommittee hearing on an earlier version of the Bill.  See Preservation of Historic and

20

Prehistoric Ruins, Hearing before the Subcomm. of the Senate Committee on Public Lands, 58th

Cong. Doc. No. 314, at 24 (1904).  There, Senator Fulton had the following exchange with the

Commissioner of Indian Affairs:

> Senator FULTON: I suppose the public lands would include these
> Indian reservations?
> Commissioner Jones: No; I think not.
> Senator FULTON: They are public lands, although the Indians have
> possession.
> Commission JONES: Take the Southern Ute Reservation in the case
> cited—
> Senator FULTON: Still the Government has control absolutely.

Id.

Plaintiffs maintain that this exchange, taken with the change in the final Bill's language,

demonstrates that by "control," Congress meant "absolute control."  Pl. Opp at 16.  This

argument encounters any number of problems.  For one, "[t]he remarks of a single legislator,

even the sponsor, are not controlling in analyzing legislative history," Chrysler Corp. v. Brown,

441 U.S. 281, 311 (1979), particularly where the record lacks "evidence of an agreement among

legislators on the subject."  Rivers v. Roadway Exp., Inc. 511 U.S. 298, 308–09 n.8 (1994).

Here, Plaintiffs present no persuasive evidence that Senator Fulton's statement, insofar as it in

fact reflected his view and correctly described the law, embodied Congress's view of the matter.

The Bill was ultimately passed by a different Congress several years after the hearing in

question, with no substantiated connection between Senator Fulton's statement and the language

of the final Bill.

A second problem is that Senator Fulton's remark is highly equivocal.  Based on the

hearing transcript, Fulton appeared to interrupt Commissioner Jones to answer his own question,

stating that Indian reservations "are public lands."  58th Cong. Doc. No. 314, at 24 (emphasis

added).  Indeed, when Jones was subsequently asked whether the proposed bill would allow the

21

Interior Department to protect artifacts on Indian lands, he replied, "I think this bill will cover

it[.]" Id. One reading of the exchange is that Fulton and Jones agreed that the proposed Bill's

coverage of public lands would include Indian lands. If that were so, it would mean the addition

of the phrase "lands controlled by the federal government" did not arise from this exchange. The

takeaway is that the isolated comments Plaintiffs pick out are, to put the matter generously,

equivocal and therefore unreliable evidence of legislative intent.

Even if Plaintiffs were correct that the proposed Bill was amended to ensure the Act

covered Indian lands, that would not mean that "control" means "absolute control." Contrary to

Senator Fulton's statement, the federal government did not (and does not) maintain absolute

control over Indian lands. The Supreme Court said as much in United States v. Sioux Nation of

Indians, 448 U.S. 371 (1980): "[A] reviewing court must recognize that tribal lands are subject to

Congress' power to control and manage the tribe's affairs. But the court must also be cognizant

that 'this power to control and manage [is] not absolute.'" Id. at 415 (emphasis added) (quoting

United States v. Creek Nation, 295 U.S. 103, 109 (1935)); see also American Indian Law

Deskbook § 3.8 (May 2018) ("Tribes and individual Indians have acquired significant control

over their land and its resources."). So, even if Congress had in mind the level of control the

federal government had over Indian lands when it added the word "control" to the Antiquities

Act, it would not support Plaintiffs' "absolute control" interpretation.

The more persuasive interpretation of "control" does not require inserting an adjective in

front of the word to achieve a desired meaning. See EEOC v. Abercrombie & Fitch Stores, Inc.,

135 S. Ct. 2028, 2033 (2015) ("The problem with this approach is the one that inheres in most

incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought

to be a desirable result."). Instead, it tracks the ordinary understanding of the term, as discussed

above and as reflected in the way the Supreme Court has used the term. The Court's decision in California is a good example. Recall that the Court in that case affirmed that the federal government "controlled" the waters in the territorial sea, supporting the President's authority to establish the Channel Islands National Monument. See 436 U.S. at 36 (discussing United States v. California, 332 U.S. 804, 805 (1947)). Even Plaintiffs appear not to contest that the federal government controls the territorial sea. Yet that control is neither "complete" nor "absolute." States may exercise their police powers there. See United States v. Louisiana, 394 U.S. 11, 22 (1969). Other nations have "the right of innocent passage" through that territory — *viz.*, passage that "is not prejudicial to the peace, good order, or security of the coastal state." Restatement (Third) of Foreign Relations Law § 513 (last updated June 2018). When it stated that the federal government "controlled" the territorial sea, California, 436 U.S. at 36, the Court thus had in mind something short of absolute control; it instead understood the term to mean something closer to, in dictionary parlance, "to exercise directing or restraining influence over." Webster's First at 490.

Additional instances abound of the courts' and Congress' defining areas of the ocean like the territorial sea and beyond as under federal-government control. See, e.g., Outer Continental Shelf Lands Act, 43 U.S.C. § 1331(a) (defining outer continental shelf in part as submerged lands subject to federal "jurisdiction and control"); see also Native Vill. of Eyak v. Trawler Diane Marie, Inc., 154 F.3d 1090, 1091 (9th Cir. 1998) (acknowledging "sovereign control and jurisdiction of the United States to waters lying between 3 and 200 miles off the coast"). The bottom line: Plaintiffs are wrong when they assert that the Antiquities Act only extends to lands the federal government completely controls. The voyage is not over, however. This determination still leaves open the question of whether the government has enough influence

23

over the Exclusive Economic Zone under the Antiquities Act to constitute "control," which issue the Court turns to next.

2. *Control of the EEZ*

Three considerations convince the Court that the federal government sufficiently controls the Exclusive Economic Zone — where the Northeast Canyons and Seamounts National Marine Monument is located — to empower the President under the Antiquities Act. First, the federal government exercises substantial general authority over the EEZ, managing natural-resource extraction and fisheries' health and broadly regulating economic output there. Second, it possesses specific authority to regulate the EEZ for purposes of environmental conservation. Third, no private person or sovereign entity rivals the federal government's dominion over the EEZ.

Some background to start. Customary international law, which is ordinarily deemed binding federal law in the United States, sets forth the rights and responsibilities of nations in different parts of the oceans and their corresponding seabeds. See Restatement (Third) of Foreign Relations Law § 511, Cmt. D; see also The Paquete Habana, 175 U.S. 677, 700 (1900). Abutting the coastline of the United States lies the territorial sea, a body of water extending up to twelve nautical miles from the coast. See Restatement (Third) of Foreign Relations Law § 511(a). Beyond the territorial sea is the EEZ, which "may not exceed 200 nautical miles" from the point at which the territorial sea is measured. Id. § 511(d). To refresh the reader, the Monument at issue lies about 130 miles off the coast of New England, and Plaintiffs do not dispute that it plainly sits within the EEZ. See Compl., ¶ 2.

Consistent with international law, President Reagan established the EEZ out to 200 nautical miles in 1983. See Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983). In

24

that Proclamation, he claimed for the United States the authority recognized under international law, including: (1) the sovereign right to "explor[e], exploit[], conserv[e] and manag[e] natural resources, both living and non-living, of the seabed and subsoil and superadjacent waters"; (2) the rights to pursue "other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds"; (3) "jurisdiction with regard to the establishment and use of artificial islands, and installations and structures having economic purposes"; and (4) the responsibility for "protection and preservation of the marine environment." Id. The Government therefore possesses broad sovereign authority to manage and regulate the EEZ. That wide-ranging authority obviously tips the scale towards finding that it controls the EEZ under the Antiquities Act.

Second, the federal government has the specific authority to regulate the EEZ for purposes of marine conservation. As President Reagan explained in his proclamation, the federal government maintains in the EEZ "jurisdiction with regard to . . . the protection and preservation of the marine environment." Id. International law likewise acknowledges the federal government's ability to issue and enforce laws and regulations related to marine conservation in the EEZ. See Restatement (Third) of Foreign Relations Law § 514, Cmt. i; see also U.N. Convention on the Law of the Sea, *e.g.*, Art. 65 (affirming coastal nation's rights to regulate marine mammals in EEZ for purposes of marine conservation), Arts. 61–62 (providing for coastal nation's responsibilities for fishery management and conservation).

This specific authority exists not just on paper. Rather, the federal government exercises close management and regulation of marine environments in the EEZ. One way it does so is through the National Marine Sanctuaries Act, mentioned above. See 16 U.S.C. § 1431 *et seq*. Under that Act, the federal government declares marine sanctuaries in the EEZ, over which it

25

exercises "authority for <u>comprehensive</u> and coordinated <u>conservation</u> and <u>management</u>." <u>Id.</u> § 1431(b)(2) (emphases added). Another is through fisheries management under laws like the Magnuson-Stevens Act. <u>Id.</u> § 1801 *et seq.* One purpose of that Act is "to take immediate action to <u>conserve</u> and <u>manage</u> the fishery resources found off the coasts of the United States . . . by exercising (A) <u>sovereign rights</u> for the purposes of exploring, exploiting, conserving, and managing <u>all fish, within the exclusive economic zone</u>." <u>Id.</u> § 1801(b)(1) (emphases added). Of course, such enactments do not on their own give the federal government the power to establish national monuments in the EEZ — only the Antiquities Act can do that. But they shed light on what <u>kind</u> of control the federal government exercises over the EEZ. As the Court sees it, the fact that the federal government maintains and exercises specific authority under domestic and international law to "protect the marine environment in the EEZ" strongly suggests that Congress would have understood the Government to maintain the requisite level of control under the Antiquities Act. <u>See</u> 24 Op. O.L.C. at 197 (suggesting that federal government's ability to regulate marine environments essential to question of control of EEZ under Antiquities Act).

Third, the federal government's control over the EEZ is unrivaled. As explained, the United States exercises sovereign rights there for a host of purposes, including natural-resource extraction, fisheries management, marine conservation, and the establishment of artificial islands. No other person or entity, public or private, comes close to matching the Government's dominion over that area — whether for the purposes discussed already or for any others. That matters a great deal for understanding the sufficiency of the Government's control over the EEZ. For just as control can be defined by the <u>presence</u> of dominion or authority over something, so the <u>absence</u> of control can be underscored by the presence of someone else's dominion or

26

authority over that same thing. That no one else challenges the federal government's control over the EEZ thus suggests that it possesses, rather than lacks, control of the area.

Yet, as discussed earlier, the Government does not claim to exercise complete control over the EEZ. Other nations may exercise "the freedoms of navigation and overflight" there, as well as the "freedom to lay submarine cables and pipelines." Restatement (Third) of Foreign Relations Law § 514(2). But those limitations on U.S. control in the EEZ are not all that different from those in the territorial sea, which the Supreme Court has affirmed <u>is</u> controlled by the federal government. <u>See</u> <u>California</u>, 436 U.S. at 36 (discussing <u>California</u>, 332 U.S. at 805). In the territorial sea, as mentioned, foreign ships maintain "the right of innocent passage" — defined as passage that is "not prejudicial to the peace, good order, or security of the coastal state." Restatement (Third) of Foreign Relations Law § 513(1)(a)–(b). Foreign ships thus pass through the territorial sea, just as they pass through the EEZ. More broadly, the presence of foreign ships and undersea cables does not vitiate the other forms of Government control of the EEZ, discussed in detail above.

These three considerations demonstrate that, under any of the range of definitions referenced above — to regulate, to dominate, to overpower, to curb, to exercise restraining or directing influence over — the federal government's control here is adequate. It bears mentioning that this conclusion is not novel. In 2000, the Office of Legal Counsel in the Department of Justice — in an opinion drafted by Randolph Moss, now a highly regarded judge in this district — concluded, based on very similar considerations, that the federal government controlled the EEZ for purpose of the Antiquities Act. <u>See</u> 24 Op. O.L.C. at 195–97. The Government thus appears to have maintained for over fifteen years the same understanding prior to the creation of the Monument at issue here. Likewise, several courts, while not deciding the

27

issue raised in this case, have described the EEZ as subject to control of the federal government. See Native Vill. of Eyak, 154 F.3d at 1091 (United States has "sovereign control and jurisdiction . . . to waters lying between 3 and 200 miles off the coast"); R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 965 n.3 (4th Cir. 1999) (United States has "exclusive control over economic matters involving fishing, the seabed, and the subsoil"). Even Congress has described the area as "subject to [federal] jurisdiction and control." 43 U.S.C. § 1331(a). This Court can be added to that list. For all the reasons outlined, the federal government controls the EEZ for purposes of the Antiquities Act.

### 3. *Plaintiffs' Counterarguments*

Not ready to head back to shore, the Lobstermen offer three arguments to the contrary that the Court has yet to address. First, they claim that interpreting the Antiquities Act to reach the EEZ conflicts with the Fifth Circuit's decision in Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, 569 F.2d 330 (5th Cir. 1978). See Pl. Opp. at 33–34. The Court disagrees for two reasons. For one, that decision predated President Reagan's Proclamation establishing U.S. control over the EEZ. While the federal government had previously claimed dominion over the area's minerals, see Proclamation No. 2667, 10 Fed. Reg. 12,303 (Oct. 2, 1945), it had not yet claimed the broader authority discussed in detail above. The non-binding case might well have come out differently had it occurred after Reagan's proclamation.

For another, that decision addressed the Antiquities Act's reach with respect to a historic — rather than a scientific — object. As the Office of Legal Counsel has explained, the Government might well have the authority to declare a scientific object in the EEZ to be a national monument to advance conservation goals, yet lack the authority to declare a historic

object one to advance historic-preservation goals. See 24 Op. O.L.C. at 196. That is because the Government possesses the sovereign right to regulate the EEZ for purposes of marine conservation, which the Court found persuasive above, yet lacks any sovereign right to regulate or salvage historic objects there. While the Court need not decide the matter, the upshot is that the Fifth Circuit's decision could be correct if decided today and still have no bearing on this Court's conclusion that the President may establish this national monument in the EEZ.

Second, Plaintiffs maintain that the Antiquities Act cannot reach certain territory that was not controlled by the United States when the Act was passed in 1906. See Pl. Opp. at 17–18. But Congress did not freeze the Act's coverage in place in 1906. Rather, by referring to "lands controlled by the U.S. Government," the legislature intended for the Act's "reach [to] change[] as the U.S. Government's control changes." 24 Op. O.L.C. at 191. In line with that understanding, Presidents have declared national monuments in areas that were not under U.S. control in 1906. See, e.g., Proclamation No. 3443, 76 Stat. 1441 (1961) (Buck Island in the Virgin Islands). Plaintiffs concede that "Congress anticipated the federal government obtaining additional lands within categories covered by the Act," but insist that Congress did not want the Act to extend to "areas that were categorically ineligible for federal ownership or control in 1906." Pl. Opp. at 17–18. Any distinction between the two is illusory. The federal government did not control lands in the Virgin Islands in 1906, but once it gained such control, it could declare national monuments there. Likewise, the federal government did not control the waters from 3 to 200 miles off the coast in 1906, but once it gained such control under international and domestic law, it could declare national monuments there. Plaintiffs offer no evidence that Congress would have intended to treat the EEZ and the Virgin Islands any differently — if

29

expansion in U.S. control and ownership can expand the Act's scope as to one, logically it can expand the Act's scope as to the other.

The Lobstermen finally resort to a classic slippery-slope argument: If the Act reaches the EEZ, it could reach anywhere, up to and including private property. Id. at 20–21. Plaintiffs can rest easy: The slope, assuming there is one, has plenty of traction. To start, the Court does not understand the Antiquities Act to reach anywhere the Government can regulate. Such a reading would indeed expand the Act's scope to a host of private lands outside the Government's control. Rather, in concluding that the Antiquities Act reaches the EEZ, the Court has emphasized that the Government possesses broad dominion over the area, that it possesses specific regulatory authority over the subjects of the Monument, and that its authority there is unrivaled. The last point particularly addresses Plaintiffs' concern about private property. Had a private person or entity exercised some control or ownership over the EEZ, that would indicate the federal government lacked the requisite control over the area. See *supra* at 27. In all, the Court's narrow reading of "land controlled by the federal government" poses few of the hurricane-is-coming concerns Plaintiffs raise.

D. Smallest Area

Finally nearing harbor, the Court addresses Plaintiffs' fact-specific arguments about the boundaries of the Monument. Recall that the Antiquities Act requires monuments to be "confined to the smallest area [of land] compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(b). But to obtain judicial review of claims about a monument's size, plaintiffs must offer specific, nonconclusory factual allegations establishing a problem with its boundaries. See Mountain States, 306 F.3d at 1137. Plaintiffs allegations here do not rise to that level.

The Lobstermen offer the following factual allegations about the Monument's size:
(1) "The monuments['] boundaries bear little relation to the canyons and seamounts, thereby prohibiting much fishing outside of these areas that would have no impact on the canyons, seamounts, or the coral that grows on them.  Between Retriever and Mytilus Seamounts, for instance, the monument encompasses areas that are dozens of miles from the nearest seamount. Yet in other areas, the monument's boundary lies right next to a seamount excluding areas that are at most only several miles away"; and (2) "the monument's canyon unit broadly sweeps in the entire area between the canyons, as well as significant area closer to the shore than the canyons."  Compl., ¶¶ 73–74.  The crux of the Lobstermen's argument seems to be that the Monument reserves large areas of ocean beyond the objects the Proclamation designated for protection.  Id.  The problem is that this position is based on the incorrect factual assumption that the only objects designated for protection are the canyons and seamounts themselves.  The Proclamation makes clear that the "objects of historic and scientific interest" include not just the "canyons and seamounts" but also "the natural resources and ecosystems in and around them." Proclamation at 2.  Insofar as Plaintiffs allege otherwise, the Court need not accept such allegations as true because they "contradict exhibits to the complaint or matters subject to judicial notice."  Kaempe v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004).

With that cleared up, it becomes obvious that Plaintiffs' allegations are insufficient. Even if it were true that the Monument's boundaries do not perfectly align with the canyons and seamounts, that would not call into question the Monument's size.  As Intervenors explain, the Monument's boundaries presumably align with the resources and ecosystems around them.  See ECF No. 44 (Intervenors Reply) at 24.  Plaintiffs allege no facts to the contrary.

31

The Lobstermen insist that the boundaries cannot be based on the ecosystems and natural resources because they are not "objects" under the Antiquities Act.  See Compl., ¶ 75.  Not according to the D.C. Circuit and the Supreme Court, which have concluded that ecosystems are objects of scientific interest under the Act.  See Alaska, 545 U.S. at 103; Cappaert, 426 U.S. at 141–42; Cameron, 252 U.S. at 455–56; see also Tulare County v. Bush, 306 F.3d 1138, 1142 (D.C. Cir. 2002) ("Inclusion of such items as ecosystems and scenic vistas in the Proclamation did not contravene the terms of the statute by relying on nonqualifying features.").  Plaintiffs also suggest that highly migratory species cannot be designated as monuments under the Act because they are not "'situated' upon federal lands." Pl. Opp. at 39–40.  Their concerns are misplaced: the Proclamation did not designate highly migratory species as objects — it instead so designated the ecosystems surrounding the canyons and seamounts.  See Proclamation at 2.  Insofar as they might relatedly suggest that the ecosystems are not situated on federal lands, they would be mistaken.  As the Proclamation explains, the protected ecosystems are formed by "corals" and "other structure-forming fauna such as sponges and anemones" that physically rest on, and are otherwise dependent on, the canyons and seamounts themselves.  Id.

In all, Plaintiffs offer no factual allegations explaining why the entire Monument, including not just the seamounts and canyons but also their ecosystems, is too large.  The Court therefore need not undertake further review of the matter.

## IV.    Conclusion

For these reasons, the Court will grant Defendants' Motion to Dismiss under Rule 12(b)(1).  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 5, 2018

32

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**MASSACHUSETTS LOBSTERMEN'S**
**ASSOCIATION,** *et al.***,**

      **Plaintiffs,**

          **v.**                                    **Civil Action No. 17-406 (JEB)**

**WILBUR J. ROSS, Jr.,** *et al.***,**

      **Defendants.**

## ORDER

      For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

    1.   Defendants' Motion to Dismiss is GRANTED; and

    2.   The case is DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

                /s/ *James E. Boasberg*
                JAMES E. BOASBERG
                United States District Judge

Date:  October 5, 2018

1